J-A06031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| NICOLE R. SMITH | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER N. KOCHER | : | |
| | : | |
| Appellant | : | No. 964 WDA 2023 |

Appeal from the Order Entered August 18, 2023
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-17-003323-017

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY BECK, J.:          **FILED: March 25, 2024**

Christopher N. Kocher ("Father") appeals from the custody modification order related to L.K. ("Child"), born in June 2014, which awarded Nicole R. Smith ("Mother") and Father shared legal custody and Mother primary physical custody of Child during the school year and Father primary physical custody of Child during the summer.[1] Father raises various claims regarding the trial court's credibility determinations, argues that trial court should have

---

[1] Although this appeal involves a custody action, we will use the parties' names in the caption "as they appeared on the record of the trial court at the time the appeal was taken." Pa.R.A.P. 904(b)(1). "[U]pon application of a party and for cause shown, an appellate court may exercise its discretion to use the initials of the parties in the caption based upon the sensitive nature of the facts included in the case record and the best interest of the child." Pa.R.A.P. 904(b)(2); **see also** Pa.R.A.P. 907(a). Neither party applied for the use of initials in the caption. We will, however, refer to the minor involved in this custody dispute as "Child" to protect her identity.

maintained the prior custody determination made by a different judge and further limited Mother's custodial time, and asserts that the trial court abused its discretion in failing to allocate a portion of the cost of the psychological evaluation to Mother. After review, we affirm.

Mother and Father were in a relationship starting in March 2013 but never married. The parties had Child in June 2014. They ended their relationship in December 2016 but lived together until February 2017. Following their separation, the parties lived in the same city. In March 2017, Mother filed a custody complaint seeking primary physical custody of Child. Thereafter, the trial court entered a consent order wherein the parties agreed to share physical and legal custody of Child.

In January 2019, because Mother's fiancé's job was being transferred, Mother filed a petition to relocate with Child to North Carolina. In April 2019, the trial court entered an interim order permitting Mother to move with Child to her mother's residence in Connellsville, Pennsylvania. The trial court noted that Mother had to arrange for housing in North Carolina pending the final relocation hearing in the case. In May 2019, the trial court entered an order permitting Mother to permanently relocate to Raleigh, North Carolina, and granting Mother primary physical custody and Father partial physical custody.

Subsequently, Father filed a motion to modify custody, seeking primary physical custody of Child. Father alleged that Mother had left her then-

husband and moved with Child to Bridgeport, West Virginia,[2] which was near her new boyfriend, without notice.

The case proceeded to a four-day custody trial before the Honorable Jennifer Satler. Judge Satler weighed the custody factors set forth at 23 Pa.C.S. § 5328(a),[3] and found four of the custody factors (1, 4, 9, 13) favored Father, while the remaining factors were neutral or inapplicable. Judge Satler particularly noted that Father could provide more stability to Child, as he has lived in his residence since 2013, while Mother had moved multiple times and could not provide the same level of stability. Ultimately, on December 28, 2020, Judge Satler entered an order granting the parties shared legal custody, Father primary physical custody during the school year, Mother partial physical custody during the school year, and the parties alternating custody week-by-week in the summer.

_____

[2] Mother indicated that four days after she moved to North Carolina, she ended the relationship with her new husband and moved back to Pennsylvania. Shortly thereafter, she moved to Bridgeport.

[3] The Custody Act provides a non-exhaustive list of the sixteen factors a court is required to consider to determine the best interests of the child. 23 Pa.C.S. § 5328(a). "All of the best interest factors ... are required to be considered by the trial court when entering a custody order." **D.Q. v. K.K.**, 241 A.3d 1112, 1118 (Pa. Super. 2020) (citation and brackets omitted). The trial court, as the finder of fact, determines "which factors are most salient and critical in each particular case." **M.J.M. v. M.L.G.**, 63 A.3d 331, 339 (Pa. Super. 2013). Additionally, in any custody action, the trial court must "delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S. § 5323(d). As Father's appeal does not relate specifically to the trial court's consideration of the custody factors, we do not list them here.

In June 2021, Mother filed a petition to modify custody, seeking primary physical custody and shared legal custody. Mother argued that she could provide Child a stable living environment and that Father fails to coparent or consider Mother's custodial rights regarding Child, including prohibiting her involvement in Child's life. Because Judge Satler had been reassigned to the criminal division, the case was assigned to the Honorable Nicola Henry-Taylor. After several failed conciliations, Father filed an answer and counter-petition to Mother's petition, seeking sole legal custody and shared physical custody of Child, which would grant him more time with Child in the summer and less weekend time for Mother. In support of his counter-petition, Father indicated that Mother disparaged him in the presence of Child and instructed Child in Wicca[4] and how to put curses on people.[5] Father also filed two motions for special relief: (1) requesting psychological evaluations of both parties, Child,

---

[4] Wicca "is a neo-pagan, polytheistic, and pantheistic faith based on beliefs that predate Christianity." **Knowles v. Pfister**, 829 F.3d 516, 518 (7th Cir. 2016). The religion "affirms the existence of supernatural power (such as magic) and of both male and female deities who inhere in nature and that emphasizes ritual observance of seasonal and life cycles." https://www.merriam-webster.com/dictionary/Wicca (last visited Mar. 14, 2024).

[5] Notably, in West Virginia, Mother owns and operates Indigo Moon, LLC, which the trial court describes as a "'new age/metaphysical shop' selling crystals, herbs, incense, and related merchandise as well as providing personal services such as tarot reading and reiki. Certain items sold at Indigo Moon are … connected with Wicca … and the business attracts a certain clientele who are favorably disposed toward Wicca." Trial Court Opinion, 8/14/2023, at 3 (unnumbered).

and any other essential parties and (2) requesting an order forbidding Mother from indoctrinating Child in Wicca without his consent.

On October 28, 2022, the trial court entered an order prohibiting Mother from exposing Child to Wicca beliefs, discussions, or events without Father's express consent or an order from the court. On the same date, the trial court entered an order directing the performance of psychological evaluations with the cost of the evaluation to be paid by Father, subject to reallocation.

The trial court appointed psychologist Patricia Pepe, Ph.D., of Allegheny Forensics as the psychological evaluator. In conducting her evaluation, Dr. Pepe interviewed Mother, Father, and Child; observed family interactions; was given other collateral information from the parties, including information about Mother's GoFundMe crowdfunding campaign to aid in the child custody dispute and classes offered by Indigo Moon involving Wicca; and spoke with the coparenting mediator, Karen Firestine ("Firestine"), and Child's therapist, Danielle Parrish ("Parrish"). Thereafter, Dr. Pepe submitted a report and recommendations, noting multiple concerns related to Mother engaging in alienating behavior against Father, the amount of time Child spends at Mother's store, and Child's knowledge of Mother's GoFundMe page. Dr. Pepe suggested restricting Mother's custodial time with Child and awarding Father primary legal custody and primary physical custody for longer periods.

On March 15, 2023, the parties engaged in a pretrial conciliation with the Judge Henry-Taylor. Because they were unable to resolve matters, Judge

Henry-Taylor scheduled a custody trial. Prior to the scheduled trial, however, Judge Henry-Taylor recused herself sua sponte and the Honorable Chelsa Wagner was assigned to the case. Father requested an updated psychological evaluation because Mother's parental alienation had worsened since Dr. Pepe's original evaluation of Mother. Judge Wagner denied the request.

The matter proceeded to trial at which, inter alia, Mother, Father, Father's fiancée, Lisa Citriniti, Firestine, and Dr. Pepe testified; Child did not testify. Following trial, Judge Wagner discounted Dr. Pepe's testimony and recommendations, finding that she harbored bias against Mother and did not approve of Mother's lifestyle or beliefs related to Wicca, which contributed to her final opinion. Judge Wagner noted that there was no evidence that Mother practiced Wicca, or how any of that information impacted Child. Additionally, Judge Wagner found Dr. Pepe's opinion was based upon Father's version of the facts, which the judge found incredible. Judge Wagner found Mother's testimony to be credible.

Judge Wagner weighed the custody factors set forth at section 5328(a), and found five of the custody factors (1, 4, 9, 10, 13) favored Mother, factor (2) favored Father, and the remaining factors were neutral or inapplicable. Ultimately, Judge Wagner entered an order awarding the parties shared legal custody, Mother primary physical custody and Father partial physical custody of Child during the school year, and Father primary physical custody and

Mother partial physical custody of Child during the summer. Father filed a timely appeal and a Pa.R.A.P. 1925(b) concise statement.

Father raises the following questions for our review:

1. Did the Trial Court erred [sic] and/or abuse its discretion in "discounting and disregarding" the testimony, Evaluation and Recommendations of its own witness, sua sponte, after Trial when no grounds for impeachment were raised during Trial[?]

2. Did the [Trial] Court err and/or abuse its discretion in determining, sua sponte, that L.K could know about Court Proceedings and Father's testimony on her own and that there was no parental alienation as indicated by the Court's own expert witness, whenever the Court did not even interview L.K.[?]

3. Did the [Trial] Court err and/or abuse its discretion in not only discounting and disregarding the Evaluation and Recommendations of his own expert witness, but totally reversing the Honorable Jennifer Satler's Order of Court and granting Mother primary physical Custody of L.K. when the Court's Expert's Recommendation was that Mother's custodial time should be limited due to her parental alienation[?]

4. Did the Trial Court err and/or abuse its discretion in not allocating a portion of the cost of the Psychological Evaluation to Mother[?]

Father's Brief at 4-5.

Our standard of review in this case is deferential:

We review a trial court's determination in a custody case for an abuse of discretion, and our scope of review is broad. Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence. We defer to the trial judge regarding credibility and the weight of the evidence. The trial judge's deductions or inferences from its factual findings, however, do not bind this Court. We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.

- 7 -

*C.A.J. v. D.S.M.*, 136 A.3d 504, 506 (Pa. Super. 2016) (citation omitted).

"With any child custody case, the paramount concern is the best interests of the child." *M.J.M.*, 63 A.3d at 334 (citation omitted). "This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." *Id.* (citation omitted).

In his first claim, Father contends that the trial court abused its discretion in discounting and disregarding Dr. Pepe's testimony. Father's Brief at 14. Father argues that the trial court's finding that the psychologist was biased against Mother and unduly focused on Mother's connection to Wicca or Satanism is not supported by the record. *Id.* at 15, 18, 20-21. Father states that Dr. Pepe did not testify to any of these topics during direct examination and were barely mentioned in her report. *Id.* at 15-16. According to Father, it is the trial court, not the psychologist, who repeatedly mentioned Wicca and Satanism in its Rule 1925(a) opinion. *See id.* at 18. Father asserts that he testified to Wicca events because Mother had disregarded a prior order entered by Judge Henry-Taylor, which prevented Mother from exposing Child to Wicca beliefs or discussion without Father's consent or order of the court. *Id.* at 17; *see also id.* (noting that Father and Mother had shared legal custody and they had to discuss any religious decisions). Father also claims that the trial court could not impeach its own expert witness because she testified consistent with her report. *Id.* at 18-21. Likewise, Father argues the

trial court could not have ascertained that its own witness was biased, as it did not question or discredit her. *Id.* at 18, 20-21.

We have previously discussed the interplay between the trial court and a testifying expert in a child custody matter:

> The trial court [is] under no obligation to delegate its decision-making authority to [an expert witness]. It is an abuse of discretion, however, for a trial court to dismiss as unpersuasive, and to totally discount, uncontradicted expert testimony. Accordingly, while a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 20 (Pa. Super. 2010) (en banc) (citations and quotation marks omitted).

Regarding Dr. Pepe's references to Wicca and Satanism, we observe the following from the expert report submitted into evidence:

> Events [at Indigo Moon] include "New Moon" events, seemingly occurring late at night. Included are classes related to Wicca. Included in the flyer [provided to the psychologist by Father] are images of pentagrams, which is often used to represent Satanism. I cannot imagine an eight-year-old exposed to such symbolism and how she makes sense of the image. While I am making every attempt to be open minded and objective, I just cannot help being concerned of the potential impact on a young child.
>
> * * *
>
> I am not being biased toward the position of Wicca. It is defined as a modern syncretic, pagan religion. And certainly, we have a right to religious freedom. My concern is using pentagrams on the advertisements for [Mother's] classes. A pentagram is drawing a circle around the five points used by Wiccans and in paganism. And while it may be innocuous, it is also the most

- 9 -

notable and widespread symbol of Satanism. I simply cannot imagine what impact this symbolism has for an eight-year-old child.

Father's Exhibit V (Dr. Pepe Report), at 17, 19.

During her testimony, Dr. Pepe made a single reference to Wicca, which occurred on cross-examination by Mother's counsel[6] in response to a question about her conversations with the coparenting counselor:

What I said to [the coparenting mediator], what we discussed is what I wrote in my summary. I did ask her, which I don't have in my summary, … what her thoughts were about the implications of [W]icca and did she have concerns about that and were any of those issues topics in co-parenting.

*Id.* at 239. Dr. Pepe did not recall what the coparenting counselor stated but noted that she wrote her summary with this information. *Id.*

The record further reflects that the parties extensively introduced evidence regarding Mother's exposure of the Child to Wicca throughout trial, including citing the order entered by Judge Nicola-Taylor prohibiting Mother from talking about Wicca. *See, e.g.,* N.T., 6/30/2023, at 31, 32, 39, 41, 68-69, 70-71, 140, and N.T., 6/29/2023, at 210-11, 215 (various references to Wicca during Father's testimony); N.T., 6/29/2023, at 165-66, 174-75 (Firestine's testimony about Father's concerns about Wicca); N.T., 6/27/2023, at 30-32, 39, 68, 167-71, 180-81, 189-90, 213-16, 229-30, 232 (Mother responded to questions during direct and cross-examination regarding Wicca,

_____

[6] Father called Dr. Pepe as a witness and Mother cross-examined Dr. Pepe.

and Mother stated that she is not a Wiccan, paganist, or Satanist); ***see also*** N.T., 6/30/2023, at 33 (wherein the trial court indicated the issue of Child's exposure to Wicca was before the court).

Father sought to make Mother's exposure of Child to Wicca and the nature of Mother's business/clientele an issue of concern in the case and a basis for the trial court to reject Mother's request for increased custodial time with Child. The trial court, however, found that Father offered no credible evidence that exposure to Wicca caused any detriment to Child. Trial Court Opinion, 10/23/2023, at 15-16. Notably, the trial court determined that there was no evidence that Mother follows or practices Wicca, finding Mother's testimony on this topic to be credible. ***See id.*** at 7; Memorandum and Order, 8/14/2023, at 21 (unnumbered); ***see also*** N.T., 6/27/2023, at 30, 216.

The issue of Child's exposure to Wicca was raised throughout the trial, including through the psychologist's report and testimony, and the trial court was free to weigh this evidence and the credibility of those who presented it in rendering its decision. Throughout his brief, Father essentially asks us to reject the trial court's findings and credibility determinations in favor of the factual findings and credibility determinations that he proposes and to reweigh the evidence in his favor. This we cannot do. ***See S.C.B. v. J.S.B.***, 218 A.3d 905, 913-14 (Pa. Super. 2019) ("[W]ith regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand."). The trial court's credibility

determinations regarding Mother's exposure of Child to Wicca are supported by testimony presented at trial, and it is not the role of this Court to make independent factual determinations. *See M.J.M.*, 63 A.3d at 337 (noting "[w]e must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations.") (citation omitted).

Turning to Father's argument that the trial court could not impeach the court-appointed expert, as noted above, the trial court was under no obligation to accept the conclusions of the expert so long as the court's findings are supported by the competent evidence. *See M.A.T.*, 989 A.2d at 20. The trial court found that the psychologist's ultimate conclusions lacked credibility, emphasizing that her opinions mirrored Father's version of the facts, which the court had found incredible. *See* Trial Court Opinion, 10/23/2023, at 5; Memorandum and Order, 8/14/2023, at 17-18 (unnumbered). Indeed, in addition to its credibility determinations regarding the evidence related to Child's exposure to Wicca, the trial court was troubled by the fact that the expert did not communicate with Child's therapist, Parrish, until the day she completed the report, and her failure to request or review records and notes from the parties' coparenting sessions. *See* Trial Court Opinion, 10/23/2023, at 5, 30-31 (noting Dr. Pepe did not obtain Parrish's treatment records and did not contact Parrish until the day she authored the evaluation); 31 (stating that Dr. Pepe's recommendations were made in a

factual vacuum without considering the records of Child); ***see also*** N.T., 6/30/2023, at 222-23, 243-44. Further, the trial court highlighted that the expert failed to account in her recommendation how the increased custodial time with Father would have impacted Child's relationship with Mother. ***See*** Memorandum and Opinion, 8/14/2023, at 17-18, 19 (unnumbered).

Moreover, the trial court found credible Mother's testimony that she would encourage Child's contact with Father when she had custody; that she had difficulty obtaining information about Child from Father and communicating with Child while she is in Father's care; that she does not denigrate Father in Child's presence; that she could help Child with her homework and manage her dyslexia; and that she and Child had a strong emotional bond. ***See*** Trial Court Opinion, 10/23/2023, at 12, 13, 14, 24, 27; Memorandum and Order, 8/14/2023, at 5, 6 (unnumbered); ***see also*** N.T., 6/27/2023, at 44-46, 52-53 (difficulty in receiving information about Child), 54-55 (noting that Child rarely calls her when in Father's care), 60-64, 140-42, 146-47 (wherein Mother testified that she strives not to denigrate Father in Child's presence and wants Child to maintain a bond with Father), 127-28, 129, 132-33 (Mother testified that she aids Child with her homework as well as manages Child's dyslexia), 153 (Mother testifying about close bond with Child). The trial court additionally found Firestine's testimony confirmed its credibility findings as to Mother, noting that Firestine did not find Mother to be uncooperative or contentious any more than Father was, and that Mother

appeared ready and willing to compromise with Father on contentious matters. *See* Trial Court Opinion, 10/23/2023, at 3, 29.

Given that the trial court found Mother credible, it was not manifestly unreasonable for the trial court to have declined to follow Dr. Pepe's recommendation, as the recommendation would have provided Father primary physical and legal custody of Child and less custodial time for Mother. Considering the animosity between the parties, and Child's love of both Mother and Father, the trial court found that Mother exercising primary physical custody during the school year and Father during the summer provides Child the best opportunity to spend meaningful time with both parents. *See* Memorandum and Order, 8/14/2023, at 20 (unnumbered); *see also* Trial Court Opinion, 10/23/2023, at 8-9 (noting that the new custody arrangement allows Father to exercise time on the weekends when he is not working); 12 (finding that the custody order is in Child's best interests, as she loves both parents). To that end, the trial court considered the custody factors under section 5328(a), and there is support in the record for its decision. *See C.A.J.*, 136 A.3d at 506 ("We may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings.") (citation omitted). Therefore, while the trial court considered Dr. Pepe's opinion, it found her recommendation to be unavailing in conjunction with the other evidence presented. *See M.A.T.*, 989 A.2d at 20. Accordingly, we cannot grant Father relief on his first claim. *See E.B. v. D.B.*, 209 A.3d

451, 469 (Pa. Super. 2019) (noting that "it is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion in awarding custody to the prevailing party.") (citation omitted).

In his second claim, Father contends that the trial court abused its discretion in determining that there was no parental alienation and sua sponte finding that Child had independent knowledge of the custody proceedings. Father's Brief at 21, 32.  Father cites Dr. Pepe's report, noting that both Dr. Pepe and Child's therapist, Parrish, indicated they were concerned about Mother's alienation of Father, which could damage Child's relationship with him.  *Id.* at 22-25, 28, 29-32.  To that end, Father takes issue with the trial court's finding that because the only evidence of alienation was related to the court litigation (and not negative statements about Father, his fiancée, or his family), that this somehow meant the behavior was not "parental alienation." *Id.* at 28, 32.  Father highlights that in her testimony, Firestine could not opine whether Child was being alienated because she did not know whether comments made by Child about the custody proceedings were based upon her own perception of her parents' relationship and what was occurring or if Child was parroting statements Mother made.  *Id.* at 31-32.  Father claims that

Firestine's testimony meant that the trial court could not make a ruling on alienation without hearing testimony from Child. *Id.* at 32.

Additionally, Father notes that Dr. Pepe testified that Child knew too much about the custody dispute, including that Father makes more money than Mother, the anger between the parties, and the number of significant others each party has had since they separated. *Id.* at 26-27, 30. Father also emphasizes Dr. Pepe's testimony that Child is physically aggressive with Mother, which reflected a lack of empathy and unresolved anger. *Id.* at 28-29.

The trial court found that neither party "has intentionally or purposefully acted in a manner that seeks to alienate [Child] or turn her against a party." Memorandum and Order, 8/14/2023, at 11 (unnumbered). The trial court further stated the following:

> Father offered evidence and testimony seeking to show that Mother has engaged in behavior designed to alienate the child from him. Father's contentions were supported by the custody evaluator, Dr. Pepe, who opined that the child "knew too much" about the litigation, the claims of the parties and the role of the judge. Testimony was offered about the child stating that "Daddy lied to the judge," as the reason that Father obtained primary custody. Additionally, Father submitted evidence about a fundraiser held on behalf of Mother to raise money for her legal fees called "Bring our Girl Home." Evidence suggests that [Child] knew about this fundraiser and its purpose, i.e., to allow Mother to regain custody. Father likewise attributes [Child's] negative outbursts in the house to what she is being told about him while in Mother's custody. For instance, [Child] has said, in a negative way, "You are not my mom" to [Citriniti], the fiancée.
>
> Mother testified to her efforts to consistently portray Father in a favorable light. Mother denied providing [Child] with

- 16 -

information about the lawsuit, positing that [Child's] knowledge of the legal process stems from the fact that [Child] understands that "something" happened in [c]ourt that caused her to move from West Virginia with Mother into Father's custody in Pennsylvania – and that that "something" was not the decision of either parent.

… [T]he [trial c]ourt did not ascertain any direct evidence showing Mother engaged in alienating behavior. To the contrary, from the evidence reviewed by the [trial c]ourt it appears that [Child] has positive feelings toward Father, loving both her parents very much and wishing they could "get back together." If [Child] does, indeed, have more information about these legal proceedings than she should, the [trial c]ourt did not hear evidence showing that it has negatively impacted her relationship with Father. On this score, the [trial c]ourt believes that Father is once again seeking to attribute every negative occurrence or interaction to something done by Mother. The [trial c]ourt does not find the testimony of Father and his witnesses and the custody evaluator to be credible under this factor.

*Id.* at 17-18 (unnumbered).

As discussed above, the trial court found the psychologist's testimony to be incredible. *See id.* at 17-20 (unnumbered); *see also* Trial Court Opinion, 10/23/23, at 4-5, 24. Further, the trial court found no evidence of ongoing parental alienation, noting that although Father stated that Child knew about the custody proceedings after visiting Mother, he refused to provide any specific evidence or testimony of what Child would say about the custody proceedings after her custodial visits with Mother. *See* Trial Court Opinion, 10/23/2023, at 23-25; *id.* at 25 (finding Father's testimony in this regard to be incredible); *see also* N.T., 6/30/2023, at 153-58; N.T., 6/29/2023, at 262-64. The trial court found credible Mother's testimony that she did not alienate Child against Father. *See* Trial Court Opinion,

10/23/2023, at 3-4, 12-13 (determining that Mother credibly testified that Mother would continue to support Father's role in Child's life); 24 (crediting Mother's testimony that she did not alienate Child against Father); **see also** N.T., 6/27/2023, at 58-65.  The trial court also observed that Firestine did not find Mother to be uncooperative or contentious to any greater degree than Father, and that Mother was willing to compromise with Father on contentious matters.  **See** Trial Court Opinion, 10/23/2023, at 3, 29.  Although Father blamed Mother's attempts at alienation for the problems Child is experiencing, the trial court found that Child's trauma is based upon the parties' conflict, not any information about the custody dispute.  **See id.** at 23; **see also id.** at 12 (citing testimony by Dr. Pepe stating that Child is suffering because her parents cannot get along).

We reiterate that we must defer to the factfinder for issues concerning credibility and weight of the evidence.  **See M.J.M.**, 63 A.3d at 337.  Here, Father again appears to be requesting that this Court make new factual findings or to reweigh the evidence and testimony presented by Dr. Pepe and Firestine.  Once again, we decline to do so.  **See C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (noting this Court must "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations.") (citation omitted); **see also A.V. v. S.T.**, 87 A.3d 818, 820 (Pa. Super. 2014) ("The

- 18 -

parties cannot dictate the amount of weight the trial court places on evidence."). Accordingly, we cannot grant Father relief on his second claim.

In this third claim, Father contends that the trial court abused its discretion by reversing Judge Satler's original custody determination and ignoring the expert's recommendation that Mother's custodial time be limited. Father's Brief at 33. Father argues that after Dr. Pepe released her report, Mother's alienation of Child became worse, but the trial court refused his request for a new evaluation. *Id.* at 33-34. According to Father, in advocating for less custodial time for Mother he was merely following Dr. Pepe's recommendations, which invited the trial court's disdain of him and resulted in him being guilty by association with the psychologist. *Id.* at 34-35. Additionally, Father argues the trial court evidenced bias against him by calling the proposed order he submitted "Draconian'," and comparing "Father's motives to salad being on the menu at Domino's."[7] *Id.* at 33. Father claims that the trial court's finding that the psychologist was biased was not

---

[7] More specifically, the trial court stated that "Mother's custodial proposal strikes a note of optimism and magnanimity; Father's is punitive and draconian." Memorandum and Order, 8/14/2023, at 15. Further, as to the Domino's menu simile, the trial court stated: "In his Statement of Matters Complained of on Appeal, Father posits that he only sought this order to protect L.K. from 'Parental Alienation.' Father's proposed order is no more about the prevention of parental alienation than the Domino's Pizza Menu is about salad — it may be on the menu, but it is far from the point." Trial Court Opinion, 10/23/2023, at 32-33.

supported by the competent evidence and he seeks the entry of a new order, which follows Dr. Pepe's recommendations. *Id.* at 36.

Preliminarily, we observe that Father cites to no case law to support this contention. *See* Pa.R.A.P. 2119(a) (stating that the appellant's argument must be supported by pertinent citation to authority). The failure to do so waives the claim raised on appeal. *See C.H.L. v. W.D.L.*, 214 A.3d 1272, 1276 (Pa. Super. 2019) ("It is well-established that the failure to develop an argument with citation to, and analysis of, pertinent authority results in waiver of that issue on appeal.").

Even if not waived, we reject Father's contention that Judge Wagner could not enter a modified custody order that differed from the existing custody order entered by Judge Satler. "Upon petition, a court may modify a custody order to serve the best interest of the child." 23 Pa.C.S. § 5338(a); *see also J.P. v. J.S.*, 214 A.3d 1284, 1290 (Pa. Super. 2019) ("Petitions for modification of custody orders may be entertained at any time without regard to whether there have been any material changes which would warrant a reevaluation.") (citation omitted). Judge Wagner was not bound by Judge Satler's determination because she found modification was in Child's best interest. *See K.D. v. E.D.*, 267 A.3d 1215, 1224 (Pa. Super. 2021) (noting that the trial court was not bound by a prior judge's order because the modification served the best interest of the children).

At bottom, Father's claim on appeal is that Judge Wagner was biased against him based upon her ruling adverse to him. Although he claims bias, he does not seek Judge Wagner's recusal. Even if he had, it is well settled that "[a]dverse rulings alone do not establish the requisite bias warranting recusal, especially where the rulings are legally proper." *Arnold v. Arnold*, 847 A.2d 674, 681 (Pa. Super. 2004).

Father also supports his argument with Dr. Pepe's testimony and his request to have such testimony reweighed in his favor. To this end, Father seeks for this Court order that custody be modified in accord with the evaluator's recommendation. As repeatedly stated throughout this decision in response to this request, we cannot reweigh Dr. Pepe's evidence in Father's favor. *See M.J.M.*, 63 A.3d at 337. Although Father correctly cites to some harsh language in the trial court's opinion that, in our view, is wholly unnecessary for the disposition of the case, Father has not presented sufficient argument to establish bias stemming from the trial court's credibility determinations to allow for reversal on that basis. Accordingly, we cannot grant relief on Father's third claim.

In his final claim, Father contends that the trial court abused its discretion in failing to allocate a portion of the costs of psychological evaluation to Mother. Father's Brief at 36-37. Father argues that the cost of the court-appointed psychologist is shared by the parties, usually in proportion of their income. *Id.* at 37, 39. Father asserts that the trial court's reasoning for

failing to reallocate the costs—requiring Father to pay for the evaluation because he, and not Mother, requested it, and Father was not granted the outcome he sought—is erroneous, as the trial court appointed Dr. Pepe and he had no idea what she would state in the report. *Id.* at 38-39. Father claims that the allocation of fees has never depended on the party who gains relief. *Id.* at 38. Father seeks remand for a hearing on the allocation of fees with a new judge, as Judge Wagner made up her mind on the issue. *Id.* at 39-40.

Our review of a trial court's allocation of expert fees is for an abuse of discretion. *Pavex, Inc. v. York Fed. Sav. & Loan Ass'n*, 716 A.2d 640, 647 (Pa. Super. 1998).

> Pennsylvania Rule of Civil Procedure 1915.8 provides, in relevant part:
>
> The court may order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert or experts. ... In entering an order directing an evaluation pursuant to this rule, the court shall consider all appropriate factors, including the following, if applicable:
>
> (1) the allocation of costs, including insurance coverage, if any, attendant to the undertaking of the evaluation and preparation of the resultant report and court testimony of any appointed expert[.]

Pa.R.C.P. 1915.8(1). The Rule was "intended to afford the trial court and the parties a more flexible and case-sensitive means of determining the scope and parameters of a physical and/or mental examination, including deadlines, costs, underlying data, and access." Pa.R.C.P. 1915.8, cmt.

Here, Father does not cite to any relevant statute or case law to support his claim that the trial court's determination that he pay the evaluator's fees was an abuse of discretion. *See* Pa.R.A.P. 2119(a). Indeed, Father fails to support his assertion that these fees are always divided between the parties in a custody action in any respect. The record reflects that Father requested the evaluation and Judge Nicola-Taylor indicated he would bear the costs of the psychologist. Under the circumstances, we do not find that the court abused its discretion in its allocation of expert fees to Father.

Based upon the foregoing, and the standard by which we must review the issues raised, we find no abuse of discretion. We therefore affirm the trial court's order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

3/25/2024